PLUMMER v. SANDERS.    DECEMBER 2,
1874.

An award will not be set aside for slight irregularities in the conduct of the referees, it being apparent that they acted in good faith, and that no injustice was done.

Where one of three referees, the report of a major part of whom was to be conclusive, was guilty of fraudulent misconduct in the interest of one of the parties, and the other two referees in good faith made an award in which such referee refused to join, it was *held*, that the award would not be set aside at the instance of the party in whose interest the misconduct had happened.

IN EQUITY. Bill filed May 15, 1873, by James H. Plummer against George W. Sanders and the Lake Village Savings Bank. December 1, 1873, Sanders went into bankruptcy ; and Perley Putnam, his assignee, appears and defends. Sanders filed an answer. Counsel for the bank said they supposed the case would not be pressed against the bank, and if it was, they should desire to demur. The plaintiff insisted on prosecuting the case against the bank as well as against Sanders. The court ruled that the plaintiff might amend the bill, and that the bank as well as Sanders must go to trial at this term on the merits of the bill. No pleadings were filed by the bank. Although, by not pleading, the bank was liable to have the bill taken *pro confesso*, the case was

tried upon its merits, as if proper pleadings had been filed, to raise all the questions of fact in controversy between all the parties.

January 21, 1873, the plaintiff and Sanders, in writing, submitted to the arbitration of Clark, Sanborn, and Tilton "all accounts, notes, claims, and demands whatsoever, including all partnership claims, now held by either of said parties against the other, * * and the report of said referees, or the major part of them, made in writing and delivered to the parties, shall be binding and conclusive in the premises." Clark was selected by Sanders, Sanborn by the plaintiff, and Tilton by both ; Clark was chairman.

The plaintiff and Sanders, as partners and otherwise, had transacted considerable business with each other, and the plaintiff was surety for Sanders on several notes. Sanders had brought a suit against the plaintiff, which is still pending, the claims sued being included in the arbitration. Sanders was doing a large lumber business ; had a large amount of property in his hands ; was owing a large amount of debts ; was constantly receiving large sums for lumber, and paying out what he received ; was not prompt in paying debts. These facts were generally known : he was not understood to be insolvent, but his situation was understood to be such as greatly to impair his credit, and to prevent cautious persons from trusting him to any considerable extent without security. The plaintiff and Sanders owned in common a piece of real estate, at Lake Village, called the Morgan building, subject to a mortgage to one Donovan for about $3,100. Before the date of the submission to arbitration, it was agreed that Sanders should buy the plaintiff's half of the Morgan building at the price of $4,000, the mortgage debt to be assumed by Sanders ; and on January 13, 1873 (eight days before the submission), a deed of the plaintiff's half from him to Sanders, and a note for $4,000 from Sanders to the plaintiff, had been executed, but not delivered ; the plaintiff kept the deed, and Sanders kept the note. At the first meeting of the referees, the parties and their counsel being present, before the trial began the deed and note were delivered to the referees under a parol agreement that, if the referees should find a balance due from the plaintiff to Sanders, they should indorse such balance on the note. But before this agreement was concluded, there was a protracted controversy between the plaintiff and Sanders upon the question whether, before beginning the trial, Sanders should procure the signatures of such sureties on the note that it could be discounted at a bank, or, in the language of the parties, make the note a "bankable" note. Sanders claimed that there was a large balance due him from the plaintiff, and that it was unreasonable to ask him to get sureties on a $4,000 note, when, as he claimed, it would be entirely overcome or greatly reduced in amount by the balance to be indorsed by the referees. The plaintiff, claiming there would be nothing, or a small amount at most, to be indorsed, insisted that the whole note should be made bankable before proceeding with the hearing. Sanders said if the plaintiff insisted in this demand he would abandon the arbi-

tration; that, if there should be anything left of the note when the referees indorsed the balance they found due him from the plaintiff, he would make the note bankable for what was left of it, or pay it. The difference on this point was almost irreconcilable; and the arbitration came near being abandoned. But, finally, after an hour's delay and debate, the plaintiff consented to go on with the hearing, without the note being first made bankable. In this preliminary controversy, the absorbing question was, whether the note should first be made bankable for its whole amount, or the arbitration be abandoned. The alternative, of the referees holding the deed after their award until the note should be paid or made bankable to the amount left after indorsing the balance, if any, found due from the plaintiff to Sanders, was not spoken of. Neither was it said that, when the referees had made the indorsement, they should deliver the note to the plaintiff and the deed to Sanders.

The absence of any express agreement on this point is the cause of one of the difficulties in the case. The note and deed being left in the hands of the chairman, without any express stipulation, either at the close of the preliminary controversy, or during the trial, or at the end of it, that he should not deliver the deed to Sanders until the note was paid or made bankable, the chairman supposed the deed was left with him to be delivered to Sanders when the referees made their award and indorsed on the note the balance, if any, found due from the plaintiff to Sanders; that the note was then to be delivered to the plaintiff, and that the payment or security of the note was to be arranged by the parties. The plaintiff did not intend that the deed should be delivered to Sanders until the note was paid or made bankable to the amount left due after the award, but carelessly put the deed into the hands of the chairman, and left it there at the close of the trial without any stipulation on this point. The delivery of the deed by the chairman to Sanders after the award, as contrasted with his delivering it to the plaintiff or holding it till the note was paid or made bankable, was, unfortunately, a point to which nobody's attention was particularly given or called: the minds of all were occupied by other branches of the business. When the referees made their award, May 2 or 3, they found a balance due from the plaintiff to Sanders, and the chairman indorsed the amount on the note, and, May 7 or 8, delivered the note and award to the plaintiff, and the deed and award to Sanders. Sanders put the deed on record, and mortgaged the Morgan building to the defendant's bank May 8. The plaintiff claims that the delivery of the deed was unauthorized, and that the deed and mortgage should be set aside.

A loan of $4000 from the bank to Sanders, to secure which the mortgage was given, had been negotiated and agreed upon before the award, upon the condition that Sanders got three names on his note, and, by the arbitration, got a good title to the building to be mortgaged. The note secured by the mortgage is dated March 6, 1873, and is signed by Sanders and two others. The bank has lately put the note

in suit and attached property : whether the note is secured by the attachment was a point not proved, not thoroughly investigated at this trial, and not known by the bank. May 8, when the mortgage was made by Sanders to the bank, the bank paid Donovan the amount due on his mortgage, about $3400, and paid the rest of the $4000 loan to Sanders ; and rents received by Donovan (who was in possession for the purpose of foreclosing his mortgage), to the amount of more than $200, were paid by him to Sanders. The loans were made by a committee on discounts, consisting of the treasurer and trustees. Clark and Sanders were trustees, and Clark was a member of the committee on discounts ; but he was opposed to the loan to Sanders for reasons not connected with the arbitration or Sanders's title ; and the loan was made, without his consent, by the authority of the other members of the committee. Clark wrote the mortgage from Sanders to the bank in good faith, not doubting Sanders's title, and not supposing there was or could be any question of his authority to deliver the plaintiff's deed to Sanders. The other members of the committee had previously assented to the loan to Sanders upon the conditions above named. As to the validity of the mortgage, they trusted to Clark, taking it for granted that Sanders's title was made good by means of, or in consequence of, the arbitration, understanding that his title was somehow to depend on the result of the arbitration, and that it resulted in Sanders's getting a good title. Without any express agreement on the subject among the committee, they understood that Clark would know whether Sanders got a good title ; and the mortgage, written by Clark, was received without question.

When the referees met, after the trial, to agree upon their award, they adjusted the partnership business of the parties by itself, and various other matters by themselves. They found that in the partnership business the plaintiff had paid out $1122.80 more than Sanders ; but they differed on the mathematical question whether the whole of that sum, or one half of it, should be set down as a sum which the plaintiff was entitled to recover of Sanders. At this trial, it was not disputed that, as a mere matter of mathematics, one half and not the whole should have been so set down ; but, in the deliberations of the referees, Tilton fell into the error of thinking that the whole should be allowed to the plaintiff; the other two referees came to the correct conclusion on that point ; but Sanborn, in bad faith, concealed his real opinion on that point, and pretended that he agreed with Tilton ; and Clark signed an award founded on that error, thinking it better for both parties that their controversies should be ended, even by such an erroneous award, than to leave them to litigation. May 2, all the referees signed an award that Sanders recover of the plaintiff $1500, and that " the $4000 note held by said Plummer against said Sanders shall be reduced the above amount of $1500 ; and the said Sanders is to pay the mortgage debt against the Morgan building property." The chairman made the following endorsement on the note : " May 2, 1873. Received on the within note fifteen hundred dollars, $1500.00." The

referees then separated, without any ceremony or formal adjournment, understanding that their deliberations were ended, and that nothing remained to be done but for the chairman to deliver their report to the parties upon payment of their fees,—the chairman understanding that he was also to deliver the note to the plaintiff, and the deed to Sanders, with the report, and the other referees understanding that the plaintiff was to have the note and Sanders the deed ; but as to when and whether Sanders was to have the deed without paying the note, or making it bankable, the court is unable to find they had any understanding sufficiently distinct to be appreciable.   In the forenoon of the next day, May 3, before the report was delivered or made known to either party, Clark having, upon a night's reflection, come to the conclusion that the mathematical error was too gross and unjust to go uncorrected, and having put the mathematical question, in a hypothetical case, to two accountants, who agreed with him, went to Tilton and called his attention to it ; Tilton, upon reflection, saw the error ; they · consulted Mr. Pitman (Tilton's partner), who agreed with the other two accountants ; Clark and Tilton agreed that the error should be corrected, called in Sanborn, and told him what they proposed to do. He did not assent to the correction of the mistake.   In making their award, the referees had differed as to several items in the claims of the parties, not connected with their partnership business.   Sanborn testifies that he thought certain sums ought to be allowed to the plaintiff, amounting to more than $600, which the other referees thought ought not to be allowed ; and that he signed the report (although he thought it too favorable to Sanders in that respect) as a compromise, regarding it better for the parties than litigation.   In their testimony, the referees differ as to the reason given by Sanborn on the third day of May for refusing to correct the mathematical error in the report.   Afterwards, on the same day, May 3, before the report was delivered or made known to the parties, Clark and Tilton erased their names on the report ; Clark wrote another report like the first, except the substitution of $2061.40 in the place of $1500, which change was in effect a correction of the mathematical error ; this second report Clark and Tilton signed, and explained to Sanborn, and asked him to sign, but he refused ; and Clark erased the endorsement on the note, and wrote instead the following : " May 3d, 1873.   Received on the within note two thousand and sixty-one dollars and forty-cents, $2061.40."   The change of the report and endorsement was made in good faith by Clark and Tilton, for the purpose of correcting an evident mistake.   The chairman, not being able to find either of the parties until May 7 or 8, then delivered to them the second report, and the note to the plaintiff, and the deed to Sanders.

One of the questions on which the referees differed was the amount to be allowed the plaintiff for certain timber bought of him by Sanders.   One J. D. S., who surveyed it, testified before the referees to the quantity of the timber.   Clark and Tilton thought, from his having two sets of the same figures, that the quantity was shown by one

set, that the figures were duplicates of the same amount, and that he was mistaken in testifying that each set showed half the amount. Sanborn thought the surveyor was not mistaken. After the surveyor testified, and before the award was made, Clark called the surveyor into his office, suggested to him that the figures might be duplicates of the same thing, and asked him if he was positive he was not mistaken; the surveyor insisted he was not mistaken. This affair is complained of in the bill as an irregularity. It was in good faith, and had no effect whatever. At this trial, plaintiff introduced the testimony of himself and the surveyor, tending to show that the surveyor was not mistaken, and explaining how the two sets of figures happened to be alike. The defendant offered rebutting evidence to show that the fact was as Clark and Tilton found it concerning the quantity of the timber, which the court refused to hear.

May 12, the plaintiff obtained a temporary injunction restraining the defendants from conveying or encumbering the Morgan land and building. In the evening of the same day, Sanders went to the plaintiff with a witness, and offered to pay him the balance of the note left after the endorsement of $2061.40, but the plaintiff did not assent to receive it, and no money was produced. Sanders testifies that he had money enough in his pocket, and offered to pay it then; the plaintiff testifies that Sanders said the money was at his office. Sanders was somewhat excited by liquor when he made the offer, and the court found it not proved that he had money enough with him to pay what he offered to pay. If he had had money enough, and had produced it, and made a tender, the plaintiff would not have received it unless he had been advised by his counsel to receive it, having determined to attempt to set aside the second award.

The plaintiff has never assented to either award, and claims that they should both be set aside. The prayer of the bill is, that the defendants be enjoined " from collecting any forfeiture or penal sum written in said bonds of arbitration;" that the second award be set aside and annulled; that the bank be enjoined from enforcing the mortgage; that the mortgage be set aside, cancelled, and annulled; and for such other orders and decrees as shall appear to the court equitable and just.

From the foregoing facts, the whole court are to draw such conclusions of law and fact, and to make such decree, according to law, as in their opinion is right.

The pleadings, and all papers used at the trial, and the record of the suit, *Sanders* v. *Plummer*, may be referred to as part of this case.

*Whipple, Jewell & Smith,* for the plaintiff.

*Barnard* and *Stone,* for the defendants.

CUSHING, C. J.   I find the following facts, which I think ought to be inferred from the facts found by the court and stated in the case:

1. Sanborn, the referee chosen by the plaintiff, acted fraudulently and corruptly in the interest of the plaintiff. The other two, constituting a majority of the board, acted honestly, and prevented the fraud of Sanborn from having any effect. Neither Plummer nor Sanders suffered from it. I do not find Plummer implicated in the fraud.

2. The conduct of Clark & Tilton, in putting their hypothetical case to the two accountants, and afterwards to Pitman, if an irregularity at all, was very slight, and produced no injury to either party.

3. The conduct of Clark & Tilton, in examining the surveyor after the hearing, was an irregularity, but done in good faith, productive of wrong to neither party, and not a gross irregularity.

4. The majority of the board of referees, with the knowledge of Sanborn, and while the report was yet under their control, corrected the award so as to do away the effect of the fraud of Sanborn, and without injustice to either party.

5. The deed was delivered to Sanders and the note to Plummer without sufficient authority, but in good faith and without any objection by either; but I do not find such opportunity for deliberation that the plaintiff ought to be held to have ratified the transaction either as against the defendant or the bank, which ought to be affected by all the knowledge which Clark had.

6. Sanders had not reason to believe that he was entitled to hold his deed until he had made his note bankable, or paid it as he agreed to.

In *Herrick* v. *Blair*, 1 Johns. Ch. 101,—"Arbitrators, after a witness had been sworn, and they were left alone to deliberate on their award, called the witness again, and, without the knowledge of the parties, examined him as to certain matters material to the controversy, of which he had given testimony before, and about which the arbitrators differed *as to what he testified on the former hearing.* An injunction to stay proceedings on the arbitration bond, on the ground of the alleged irregularity, was refused." KENT, Ch. " There was nothing done in this case by the arbitrators from which *misconduct* can be inferred. They only called a witness before them, who had already been examined in the presence of the parties, to *explain* his testimony, concerning which the arbitrators differed. It is not alleged, nor is it to be inferred, that the witness deposed differently as to any fact from what he meant to have testified, and to have been understood, on the first examination. The case does not come up to that of *Walker* v. *Frobisher*, 6 Ves. 70, for there the arbitrator, after he had told the parties that the hearing was closed, and had dismissed them, examined three more persons on the part of the defendant, and when no person was present on the part of the plaintiff. This was unfair, partial, and a gross misconduct, and contrary to all the principles of a just proceeding. There is no analogy between that case and this; and to interfere and set aside the award upon an irregularity (even admitting it to be one) so slight and immaterial as the one now set up, would be contrary to the general doctrine of the court in respect to awards. The uniform language of the cases is, that an award cannot be impeached but for corruption, partiality, or

gross misbehavior in the arbitrators, or for some palpable mistake of the law or of fact. The arbitrators are judges of the parties' own choosing; their proceedings and award are treated with great liberality, and even a mistake upon a doubtful point often will not open an award."

Where referees, after a hearing of the parties, receive and act upon the declarations of one of the parties, or of third persons made without the knowledge of the other party, their report will be set aside on the application of the party injured by such proceedings. *Bassett* v. *Harkness*, 9 N. H. 164.

In the above cited case, the award was. opened and raised from about four hundred dollars to one thousand dollars on the *ex parte* statements suggested. "It is a maxim of the courts, both of law and equity, never to raise a presumption for the sake of overturning an award; but, on the contrary, to make every reasonable intendment in its support." FOWLER, J., in *Piersons* v. *Hobbes*, 33 N. H. 31. "A court of equity will set aside an award of arbitrators whenever such manifest and palpable injustice is done as to show fraud, misconduct, or evident mistake on the part of the arbitrators." *Rand* v. *Redington*, 13 N. H. 72; *Tracy* v. *Herrick*, 25 N. H. 381. "An award will not be set aside for subtle and technical exceptions; and if the court are satisfied that the award has been fairly made, they will endeavor to maintain it, so far as may be, and all matters connected with it will receive a fair and liberal construction." *Ib.*

The result of these principles of law, applied to the case in hand, is, that the award must stand. But it does not follow that therefore the further transaction of the delivery of the deed and note must stand. Certainly, the plaintiff was not obliged to waive his right to hold on to his deed until the note had either been paid or made bankable. The award was made May 3; the parties were notified May 7 or 8; and the bill was filed May 15. We cannot see that this was an unreasonable delay, or an unreasonble time to occupy in ascertaining his rights and preparing to assert them. We think, therefore, that at present the deed of Plummer to Sanders cannot stand, and the mortgage of Sanders must fall with it.

But the mortgage of Sanders to the bank is good for his half of the property, and by means of it Sanders has so far fulfilled his part of the contract as to discharge the existing mortgage, of which discharge the plaintiff has derived the benefit, to the extent of his interest. If the plaintiff, therefore, is permitted to repudiate, now, the deed and contract, he must restore what he has received from the part execution of the contract. He must surrender the note, pay the amount awarded, which has been endorsed upon it, pay into the Savings bank, on Sanders's note, one half of the mortgage-debt which Sanders paid off, leaving Sanders's mortgage of his undivided half to stand as security for the balance of his debt to the Savings bank.

The plaintiff, complying with these terms within          days, may have a decree setting aside his deed to Sanders, and neither party

must have any costs. If the plaintiff does not comply with this direction, the defendant may pay within            days the amount due on his note to the plaintiff, and, on such payment being made, the bill will be dismissed without costs.

The bill will be retained for further directions, in case neither party should comply with the foregoing terms.

LADD and SMITH, J. J., concurred.

*Decree according to the above views.*